540 S.E.2d 278 (2000)
246 Ga. App. 328
In the Interest of U.B. et al., children.
No. A00A2185.
Court of Appeals of Georgia.
October 6, 2000.
Certiorari Denied March 2, 2001.
*279 Lloyd D. Murray & Associates, Carol B. Miller, for appellant.
Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen S. Nelson, Assistant Attorney General, Sherri P. McDonald, for appellee.
ELDRIDGE, Judge.
Appellant, the natural father of U.B. and V.B., appeals from the order of the Evans County Juvenile Court finding that the children, then approximately ages five and two-and-a-half, were deprived, relieving him and his former wife[1] and the natural mother of the children, of the custody of the children, placing them in the temporary custody of the Department of Family & Children Services ("DFCS"), and accepting DFCS's recommendation that reunification services not be provided. Finding no reversible error, we affirm the judgment of the juvenile court. Held:
1. On appeal, the children's father argues the insufficiency of the evidence to support the juvenile court's determination that the children were deprived "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for [their] physical, mental, or emotional health or morals." OCGA § 15-11-2(8)(A). "A parent may lose custody where the court determines by clear and convincing evidence that the child is deprived and will likely be harmed by such deprivation. OCGA §§ [15-11-56(b)(1)]; 15-11-34(a)(2)." In the Interest of C.N., 231 Ga.App. 639, 640(1), 500 S.E.2d 400 (1998); In re Suggs, 249 Ga. 365, 366(2), 291 S.E.2d 233 (1982); In re R.R.M.R., 169 Ga.App. 373, 374(1), 312 S.E.2d 832 (1983). Deprivation is established by showing parental unfitness upon "either intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child. [Cits.]" In re D.H., 178 Ga.App. 119, 124, 342 S.E.2d 367 (1986).
*280 Herein the State offered evidence that U.B. and V.B., then approximately five and two and a half years old, respectively, were "deprived" children who lacked appropriate parental care and control to ensure that their physical, mental, emotional, and moral needs were met because of exposure to domestic violence and mental incapacity in the mother and the father. At the termination hearing conducted in January 2000, the mother, who had a history of mental illness, admitted she had a problem with her temper; that she verbally abused the children in front of neighbors by yelling obscenities at them; that she had been required to leave a Hinesville shelter for battered women upon the shelter's claim she abused the children in the manner she spanked them; and that she was incapable of caring for the children. The mother testified that the father had beaten her throughout their marriage in the presence of the children; that the father was incapable of caring for the children because of his inability to control anger; that she feared the father's beatings; that early in their marriage he threatened her life with a machete; that more recently he threatened her life with a butcher knife; that she feared for the children because the father twice hit V.B. by striking her as she held the infant in her arms; that he spanked the children for not sleeping when told to nap; and that he used excessive force in spanking the children.[2]
The State also entered in evidence the father's long criminal history for violence at the termination hearing.[3] In other hearing testimony, a pre-school teacher testified that she believed the children had been subjected to domestic violence because U. B., whom she knew to be truthful, reported that the father held a knife to the mother's throat, cursed the mother, made the mother cry, and that she feared her parents might kill her. One of the caseworkers testified that the father had a low opinion of women, explaining that he had threatened her[4] and been abusive of his first wife and the children's mother. Another caseworker testified that the father became upset when visiting the children under DFCS supervision, physically removing them from the visitation room before being stopped by police who were called to the scene. Both children cried uncontrollably during this episode. U.B. later suffered a stress-related seizure because of it. There was evidence that U.B. had broken her arm while in the father's care, the parents thereafter variously explaining how it happened, and that the father had indicated to caseworkers he was unable to care for the children, once offering to commit himself to a mental hospital if DFCS allowed the children to remain with the mother.
On cross-examination, although generally denying the mother's allegations, the father admitted that he had been diagnosed as retarded; that he had a long history of circumstances in which he directed his anger at the mother in the presence of the children; that he was concerned to see U.B. exhibit the abusive behavior she observed in the home by spitting and cursing at the mother; and that he had a problem controlling his temper but had participated only intermittently in 12 years of counseling for the problem. Other evidence showed that the father could not *281 read, did not have a valid driver's license, and required DFCS services to assist him in his daily needs activities.
Under these circumstances, we conclude that the evidence was sufficient to permit the juvenile court to find clear and convincing evidence of U.B.'s and V.B.'s deprivation and that the father's misconduct or inability to care for their physical, mental, emotional, and moral needs rendered him unfit to retain custody. See OCGA § 15-11-81(b)(4); In the Interest of R.U., 239 Ga.App. 573, 577(1), 521 S.E.2d 610 (1999) ("On appeal, this [C]ourt neither weighs the evidence nor determines the credibility of witnesses; we defer to the juvenile court's factfinding and affirm unless the appellate standard is not met.").
2. The children's father further enumerates that there was insufficient evidence to support the juvenile court's determination that reunification not be attempted. OCGA § 15-11-58(h) pertinently provides:
[t]here shall be a presumption that reunification services should not be provided if the court finds by clear and convincing evidence that: (1) The parent has unjustifiably failed to comply with a previously ordered plan designed to reunite the family; (2) A child has been removed from the home on at least two previous occasions and reunification services were made available on those occasions; (3) Any of the grounds for the [termination of] parental rights exist, as set forth in subsection (b) of Code Section 15-11-94; or (4) Any of the circumstances set out in paragraph (4) of subsection (a) of this Code Section exist, making it unnecessary to provide reasonable efforts to reunify.
We have held that the existence of any one of the foregoing criteria is sufficient to support a presumption that further reunification efforts should not be provided. In the Interest of K.M., 240 Ga.App. 67, 71, 522 S.E.2d 667 (1999).
It is undisputed that the children were twice removed from the parents' custody and were returned to them after receiving DFCS reunification services. There was clear and convincing evidence on which to terminate the father's parental rights to the children for medically verifiable, longstanding deficiencies in the father's mental and emotional health, for imprisonment negatively impacting the children's lives, for egregious conduct toward the children, and for mentally and emotionally neglecting them. OCGA § 15-11-94(b)(4)(B)(i), (iii), (iv), and (v), respectively. See Division 1.
At the termination hearing, DFCS's caseworkers and the children's guardian ad litem unanimously recommended that reunification services not be rendered. Further, the father's treating mental health counselor at the time of the termination hearing testified that, although the father had been diagnosed with intermittent explosive disorder, he believed that depression was also present. He also opined that treatment would take two to three years; that relapse was a possibility; and that he did not recommend the children be returned to the father any earlier than a year from the time of the hearing. And, while the father testified he would never hurt the children in the future despite his difficulties with anger, "`[t]he decision as to a child's future must rest on more than positive promises which are contrary to negative past fact.' [Cit.]" In the Interest D.I.W., 215 Ga. App. 644, 646(1), 451 S.E.2d 804 (1994).
In light of the foregoing, the juvenile court, as factfinder, could have found clear and convincing evidence which showed reunification not to be in the best interests of the children for the likelihood that it would only prolong their deprivation. Therefore, the juvenile court did not err in approving the nonreunification plan. In the Interest of R.U., supra; In the Interest of S.A.W., 228 Ga.App. 197, 200(2), 491 S.E.2d 441 (1997).
3. Finally, pointing to OCGA § 15-11-58(h), the father challenges the juvenile court's order accepting the instant nonreunification plan as fatally defective for want of an express finding that its approval of nonreunification was based upon clear and convincing evidence that reasonable efforts to reunify the family would be detrimental to the children. However, OCGA § 15-11-58(h), interpreted for its plain meaning as we are required to do, Robinson v. Ray, 254 Ga. 237, 238(1), 327 S.E.2d 721 (1985), requires *282 that trial courts approve non-reunification plans upon clear and convincing evidence that reasonable efforts to reunify a child with his or her family would be detrimental to the child alone, not that non-reunification be approved by special words. To interpret it for more would elevate form over substance. This we decline to do. The instant non-reunification plan was here proper. See Division 2. Accordingly, this claim of error is without merit.
Judgment affirmed.
BLACKBURN, P.J., and BARNES, J., concur.
NOTES
[1] The mother divorced the father in 1998. She does not appeal from the juvenile court's order.
[2] In this regard, the mother testified, "When he spanks them he leaves red marks on them and it makes me mad."
[3] On December 11, 1987, the father was convicted in the Superior Court of Bulloch County of two counts of aggravated assault, two counts of pointing a pistol at another, one count of public drunkenness, two counts of terroristic threats and acts, and one count of possessing a firearm as a felon. He was sentenced to ten years confinement to serve twelve months, and the balance was probated. On February 2, 1989, after serving his sentence to confinement, the father's sentence to probation was revoked for the machete incident referenced above which arose out of a marital dispute between the mother and the father in 1988. The father subsequently pled guilty to two counts of aggravated assault and was sentenced to four years and eleven months to serve. He was paroled on January 13, 1993. His parole was revoked following an April 18, 1997 arrest upon rape and aggravated sodomy charges made by the mother and charges of terroristic threats and acts and obstruction of an officer made by a female parole officer. Subsequently, the father pled guilty to the charges made by the parole officer and was returned to prison where he remained to the date of his release in late 1997.
[4] The father told the caseworker, "[Y]ou know people get hit by cars when they go outside."