A05A0250. IN THE INTEREST OF J. B., a child.
(619 SE2d 305)

ADAMS, Judge.

J. B.'s maternal grandmother appeals from the juvenile court's order approving a plan of nonreunification. We affirm.

In reviewing an appeal from an order approving plans for non-reunification, this Court construes the evidence in favor of the judgment and determines whether a rational trier of fact could have found clear and convincing evidence that reunification services should not be provided. *In the Interest of K. R.,* 270 Ga. App. 296 (605 SE2d 911) (2004). "We neither weigh the evidence nor determine the credibility of witnesses; we defer to the juvenile court's factfinding and affirm unless the appellate standard is not met." (Citation and punctuation omitted.) Id.

The record in this case demonstrates that the grandmother was granted temporary legal custody of J. B. on May 25, 2000 pursuant to a safekeeping order issued by the juvenile court. The grandmother filed a deprivation petition on June 12, 2000. Following a hearing, the juvenile court determined that the child was deprived, specifically finding that the child's mother and father had failed to support him;

---

[4] *Rice,* supra.
[5] *Deloach v. State,* 267 Ga. App. 472 (600 SE2d 414) (2004).
[6] See *Rice,* supra.

that the father's whereabouts were unknown; that the mother had a "serious addiction" to prescription medication; and that she had unsuccessfully attempted rehabilitation on several occasions. In reliance upon the recommendation of the Department of Family and Children Services and the child's guardian ad litem, the juvenile court placed temporary legal custody with the grandmother. The record indicates that the juvenile court issued this order although the court was aware that the grandmother was an alcoholic and had a history of drug addiction because the court was convinced that the grandmother was sober and in recovery at the time she was granted custody.

DFACS subsequently removed J. B. from the grandmother's care after it received reports that the grandmother was suicidal; that 911 emergency services had received a number of calls regarding her condition; that the grandmother's physician was concerned about the grandmother's mental state; and that the grandmother had DUI and child endangerment charges pending in another county. The juvenile court issued a safekeeping order on March 1, 2002.

DFACS filed a deprivation petition on March 8, 2002, and following an adjudication hearing, the juvenile court entered a finding of deprivation on March 21, 2002. In reaching this conclusion, the court found that the grandmother had relapsed on drugs and alcohol, that she had failed to inform her primary physician that she was taking methadone when she had also been prescribed other psychotropic medication, and that she had reported to her doctor that she was emotionally upset. The court further found that the grandmother had been referred to mental health treatment, but failed to attend the scheduled appointments.

The juvenile court also found that on October 2, 2001, when the grandmother had been arrested for DUI and child endangerment, she admitted to the arresting officer that she was under the influence of medication. She later pled guilty to those charges. And the court found that the grandmother admitted at the hearing to a long history of drug and alcohol abuse, that she had relapsed, that she failed to reveal her methadone use to her doctor, and that she put J. B.'s life in danger by driving under the influence with the child in her car. The juvenile court further found that J. B. was a special needs child who was medically fragile, who needed a feeding tube and rarely slept through the night. This order was not appealed.[1]

While the deprivation order granted DFACS temporary custody of J. B., the Department developed a reunification case plan for the

---

[1] The juvenile court subsequently entered an order of nonreunification regarding J. B.'s mother and father.

grandmother. After determining that the grandmother had complied with the case plan goals by producing five negative drug screens; maintaining stable housing; obtaining treatment for her emotional/psychological problems; completing a nurturing program; and cooperating with a parent-aide, the juvenile court entered an order on February 13, 2003, transferring permanent custody of J. B. to the grandmother.

But on July 7, 2003, the child was once again removed from the grandmother's home, and the juvenile court entered another safe-keeping order after receiving reports that the grandmother was found drunk, passed out, unresponsive to the police, and unable to care for the child.

DFACS filed a second deprivation petition, and the juvenile court held an adjudication hearing. The grandmother stipulated to the allegations of the petition, including the allegation that she had been found drunk and unresponsive while caring for the child. In entering a second order of deprivation on August 13, 2003, the juvenile court found that J. B.'s safety could not be ensured due to the grandmother's recurring mental health and substance abuse problems. The juvenile court's deprivation order noted that the permanency plan was for nonreunification and termination of parental rights. This second deprivation order was not appealed.

DFACS filed a motion for nonreunification on August 25, 2003, and a judicial citizen's review panel reviewed the case on November 21, 2003. The panel approved the nonreunification plan, and the grandmother filed a request for judicial review of the panel's findings. On January 12, 2004, the juvenile court conducted a hearing on the grandmother's request for judicial review and DFACS's motion for nonreunification. At the beginning of the hearing, the court took judicial notice of the record in this case, including a letter to the court from the grandmother.

The child's DFACS case manager testified that after J. B. was removed from the grandmother's home in July 2003, DFACS decided not to offer her a second reunification case plan. Although DFACS continued to offer the grandmother visitation with J. B., the foster parents reported behavioral problems following these visits. They indicated that the child would not mind them or follow the rules at day care. The case manager testified that DFACS was intending to pursue termination of parental rights and would explore placing the child for adoption, possibly with the foster parents, who had expressed an interest in adopting J. B. She also testified that she had tried to contact the grandmother on several occasions to discuss J. B.'s case, but each time the grandmother hung up the phone on her and made no efforts to contact the case manager or to provide contact information.

A DFACS supervisor testified that it was unusual to prepare a case plan for a grandparent, but the Department did so in this case because the grandmother had been J. B.'s primary caregiver. After the grandmother completed the case plan and received custody of J. B. in February 2003, DFACS furnished her several months of aftercare services. Two to three weeks after those services ended, the grandmother got into a fight with her father and passed out drunk. DFACS was notified that the child answered the door when police arrived, and they removed him from the home. As a result, DFACS was not considering placing J. B. back with the grandmother. He testified that the foster parents had been willing to adopt J. B., but DFACS was looking to place him in a therapeutic foster home after he exhibited behavioral and emotional problems and had to be hospitalized for one week. DFACS had determined to address the child's mental and emotional health issues before placing him for adoption.

The grandmother testified that she went for inpatient drug and alcohol treatment in August 2003, but was asked to leave the program the next month before she completed her treatment. She could not explain why she was terminated from the program. After leaving, the grandmother went to stay with friends for a few months until she was able to get an apartment. She also obtained a job at Wal-Mart and purchased a car. The grandmother felt that she could provide for J. B. financially and could handle his problems. The grandmother had not returned to a drug and alcohol treatment program, but she stated that she was attending Alcoholics Anonymous and Overcomers' Outreach meetings, as well as a program called Starting Over for women who have had their children taken away from them. She stated that she had been alcohol-free since the incident in July 2003. She acknowledged in her letter to the juvenile court that she had made the conscious decision to drink in July and that the incident "must have been bad" because her father hit her, she had bruises on her arms and back, and her father filed a temporary protective order against her. The grandmother admitted that she had not contacted the caseworker, but denied hanging up on her. She also admitted that she had caused her grandson to be confused about her visits with him.

Larry Marlin, the pastor of Unity Baptist Church, testified that the grandmother had lived in his home after she left the treatment program and before she got her own apartment. He said that he never saw her drinking alcohol, that he believed that she was capable of caring for J. B. and that he felt comfortable leaving his own children with her. He also confirmed that the grandmother had attended meetings of Overcomers' Outreach and perhaps some Alcoholics Anonymous meetings. He stated that she had also attended meetings of Narcotics Anonymous.

Based upon this evidence, the juvenile court entered an order on January 14, 2004, granting DFACS's motion for nonreunification. In this order, the court acknowledged that the grandmother and the child shared a strong bond for one another, but found that there was no assurance that the grandmother would not have another relapse. The court further found that it was unfair and emotionally traumatic for J. B. to be repeatedly removed from and returned to the grandmother's home, noting that the child's emotional issues had required hospitalization on one occasion. The court concluded that it "would be detrimental to the child to reunify him with his grandmother due to the serious lack of certainty that the grandmother can or will remain alcohol and drug free."

1. The grandmother first contends that the evidence at the hearing was insufficient to allow the juvenile court to determine that returning J. B. to her home would be detrimental to the child's physical, mental, emotional, or moral well-being. Pretermitting the issue of whether the provisions of OCGA § 15-11-58 apply to a custodial grandparent, we find that clear and convincing evidence supported the juvenile court's grant of the motion for nonreunification under that statute.

Under OCGA § 15-11-58 (h),[2] reunification services are not required if the juvenile court determines by clear and convincing evidence that such efforts would be detrimental to the child. That section further states that a presumption exists that reunification services should not be provided if the court finds by clear and convincing evidence that one of four listed factors exist. OCGA § 15-11-58 (h) (1)-(4).

While the evidence in this case does not fit neatly into any of the factors so as to provide a presumption that nonreunification is appropriate, that does not mean that the trial court erred in granting DFACS's motion. One of the noted factors is proof that a parent has unjustifiably failed to comply with a previously ordered plan designed to reunite the family. OCGA § 15-11-58 (h) (1). Here, the grandmother sufficiently complied with the case plan to regain custody of J. B. in February 2003, but one of the goals of that plan was for the grandmother to prove that she could control her substance abuse. A mere five months later, she relapsed to the point of becoming so drunk that she passed out, leaving J. B. unsupervised. That episode apparently escalated to such a level of physicality, that it resulted in bruising to the grandmother and her father's application for a protective order against her. In the grandmother's words, it "must have been bad." And this occurred in the context of the

---

[2] This section was formerly designated as OCGA § 15-11-41.

grandmother's extended history of substance abuse and just two years after the grandmother pled guilty to DUI and child endangerment. This history had resulted in the child being removed from the grandmother's home and placed in foster care on two separate occasions. Further, after the second incident, the grandmother was unable to complete a course of treatment for her substance abuse, but instead was thrown out of the program.

At the time of the nonreunification hearing, J. B. was just four years old. We find that the potential seriousness of these episodes provided clear and convincing evidence from which the juvenile court could conclude that reunification with the grandmother would be detrimental to J. B., even in the absence of psychological evidence regarding the child's mental and emotional health. "[W]hen the evidence demonstrates the significant possibility that the children may be physically, emotionally, or mentally harmed if returned to their parent's care, the trial court is not obligated to return the children and wait until the children *actually* have been harmed" before terminating the child's relationship with the caretaker. (Citations omitted; emphasis in original.) *In the Interest of A. S. H.*, 239 Ga. App. 565, 571 (1) (521 SE2d 604) (1999).

Moreover, the evidence established that the child was experiencing behavioral problems, which on one occasion led to a week's hospitalization. While no evidence was presented regarding the exact nature of this episode or any resulting diagnosis, the episode was significant enough for DFACS to change its plan to place J. B. for immediate adoption to a plan of seeking therapeutic foster care to allow the child to address these issues. Thus, we find that the evidence properly supported a finding that returning the child to the unstable environment provided by his grandmother would be detrimental. See generally *In the Interest of D. L. W.*, 264 Ga. App. 168, 171 (2) (590 SE2d 183) (2003); *In the Interest of U. B.*, 246 Ga. App. 328, 331 (2) (540 SE2d 278) (2000); *In the Interest of C. N.*, 231 Ga. App. 639, 641 (2) (500 SE2d 400) (1998).

2. The grandmother next asserts that the plan of nonreunification was not in the best interest of the child because it leaves him in limbo, without a definite plan for adoption. Once again, pretermitting the issue of whether the issue of J. B.'s permanent placement was relevant to the issue of the grandmother's nonreunification plan, the evidence established that DFACS had a permanency plan of nonreunification and termination of parental rights. DFACS originally intended to place J. B. for adoption upon obtaining an order of termination, and the foster parents had indicated an interest in adopting the child. But more recently, an outburst by J. B., which resulted in a week's hospitalization, had altered those plans. In the interim, DFACS was seeking to place J. B. in therapeutic foster care

to help resolve his emotional and behavioral issues before seeking permanent adoption. Accordingly, the juvenile court could properly conclude that this plan better served the child's best interest than returning him to the unstable and potentially dangerous environment provided by his grandmother.

*Judgment affirmed. Smith, P. J., and Ellington, J., concur.*

DECIDED JUNE 24, 2005.

*Joshua J. Smith*, for appellant.
*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Richard K. Murray*, for appellee.