**FIFTH DIVISION**
**MCFADDEN, P. J.,**
**BRANCH and BETHEL, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 24, 2017**

# In the Court of Appeals of Georgia

A17A1309. IN THE INTEREST OF K. G., a child.

McFADDEN, Presiding Judge.

The mother of K. G. appeals the juvenile court order granting a petition for permanent guardianship of the child. The mother argues that the juvenile court erroneously failed to consider certain required factors when determining whether reasonable efforts to reunify her with the child would be detrimental to the child. But the court is no longer required to consider those factors. And construed in favor of the juvenile court's ruling, the record demonstrates that the juvenile court could have found by clear and convincing evidence that reunification services would be detrimental to the child. The mother has abandoned her argument that the juvenile court erred in finding the guardianship to be in the child's best interests. So we affirm.

1. *Background.*

K. G. was born with Down syndrome and a heart condition, and has special needs. The guardian, who is the mother's half sister, took the child when the mother went to the hospital for treatment of her asthma and had no one else to look after the child. The guardian did not return the child when the mother was released from the hospital, instead seeking custody based upon the child's dependency. The juvenile court entered an order finding the child to be dependent, and about two years later, granted the guardian's petition for permanent guardianship, awarding the mother visitation. The mother filed this appeal.

2. *Efforts to reunify.*

(i) *Failure to consider certain factors.*

The mother argues that the juvenile court failed to consider certain required factors before awarding permanent guardianship of the child. However, the new Juvenile Code, which governs this case, see *In the Interest of M. F.*, 298 Ga. 138, 140 (1), n. 4 (780 SE2d 291) (2015), does not require consideration of those factors. So we disagree.

Citing *In the Interest of L. B.*, 319 Ga. App. 173 (735 SE2d 162) (2012), the mother argues that, before determining whether reasonable efforts to reunify the

mother and child would be detrimental to the child under OCGA § 15-11-240 (a) (1), the juvenile court was required to consider four factors:

> (1) [whether the mother] unjustifiably failed to complete a previously ordered reunification plan, (2) [whether] the child had been removed from the home on at least two previous occasions, (3) [whether] any of the grounds for terminating parental rights set forth in [former] OCGA § 15-11-94 (b) exist, or (4) [whether] reasonable efforts to reunify are deemed unnecessary under [former] OCGA § 15-11-58 (a) (4).

*In the Interest of L. B.*, 319 Ga. App. at 176 (2). But in *In the Interest of L. B.*, we addressed the former version of the guardianship statute, OCGA § 15-11-30.1, which mandated consideration of the four factors by referencing the statute that contained them.

Specifically, that former version of the statute stated that before a juvenile court could appoint a permanent guardian of a child, it had to "[f]ind that reasonable efforts to reunify the child with his or her parent would be detrimental to the child in accordance with subsection (h) of [former] Code Section 15-11-58 [which set forth those four factors] or find that the living parents or parent of the child have consented to the permanent guardianship[.]" Former OCGA § 15-11-31.1 (a) (2) (A) (i). The new version of the guardianship statute, OCGA § 15-11-240, states in pertinent part

3

that before a juvenile court may appoint a permanent guardian of a child, it must "[f]ind that reasonable efforts to reunify such child with his or her parents would be detrimental to such child or find that the living parents of such child have consented to the permanent guardianship[.]" OCGA § 15-11-240 (a) (1). The new statute omits reference to the four factors or to any statute referencing them. We must presume that the General Assembly's omission was a matter of considered choice. See generally *Inland Paperboard &c v. Ga. Dept. of Revenue*, 274 Ga. App. 101, 104 (616 SE2d 873) (2005). Consequently, the fact that the juvenile court did not explicitly consider the four factors set forth in our former Juvenile Code and discussed in *In the Interest of L. B.*, supra, does not entitle the mother to reversal.

(ii) *Evidence supports the juvenile court's decision.*

As noted above, under the applicable statute, the juvenile court was required to find that reasonable efforts to reunify K. G. with her mother would be detrimental to K. G. OCGA § 15-11-240 (a) (1). The juvenile court made this finding, essentially determining that the mother's behavior at K. G.'s medical and therapy appointments sabotages the provision of services to K. G. In reviewing such a finding,

> this [c]ourt construes the evidence in favor of the judgment and
> determines whether a rational trier of fact could have found clear and

4

convincing evidence that reunification services should not be provided. We neither weigh the evidence nor determine the credibility of witnesses; we defer to the juvenile court's factfinding and affirm unless the appellate standard is not met.

*In the Interest of J. B.*, 274 Ga. App. 20 (619 SE2d 305) (2005) (citations and punctuation omitted).

Viewed in this light, the record demonstrates that the guardian and the mother are half sisters. K. G. was born with Down syndrome and a congenital heart defect, and has special needs. The mother made no efforts to obtain support or to prepare herself for K. G.'s birth, even though she knew that K. G. would be born with these conditions and would require services immediately. The guardian, on the other hand, contacted Babies Can't Wait in an attempt to obtain services immediately; she could not make appointments for the child because she was not the guardian at that time. Babies Can't Wait tried to work with the mother, but the mother would not cooperate.

At the time K. G. came into the guardian's care, she was six years old but could not speak. She did not understand boundaries. For example, when the door was opened or when the guardian would take her shopping, K. G would run off. K. G. would approach strangers and hug them. K. G. was not doing well in school; she was moved to a lower level class. K. G. could not follow directions and she had

behavioral problems. She could not stay seated, she would leave class, and she would stand on the desks and chairs.

When K. G. came into the guardian's care, the guardian immediately sought a psychological assessment for K. G. as well as services to address her significant needs, including speech therapy and occupational therapy. Now K. G. has weekly occupational and speech therapy appointments. K. G. works on fine motor skills, muscle development, and behavioral skills. The guardian worked with K. G.'s advocate to teach K. G. appropriate boundaries. The first day K. G. attended school while in the guardian's care, the guardian and the child's advocate developed an Individualized Education Plan for K.G.

The mother testified that when K. G. lived with her, the mother believed that the only service K. G. needed was speech therapy, which she received through school. She only learned that K. G. was far behind developmentally when the guardian took custody. Now, the mother believes, K. G. needs speech therapy and muscle therapy.

K. G. has made great improvements in the two years she has been with the guardian. She now can sit still; she can move in ways she was unable to move before, such as placing and keeping her hands on her knees, and controlling her tongue; and she has strengthened her abdominal muscles, allowing her to sit upright. Her behavior

6

in school has improved and she was promoted to the next grade. She can speak her name, she can count, she can identify colors, and she can recite the alphabet.

The juvenile court found that the mother's behavior interferes with the provision of essential services to K. G. For example, the guardian testified that initially K. G.'s therapist would discuss with the guardian K. G.'s progress, the guardian's concerns, and tasks for K. G. to work on at home. When the mother attended the sessions, however, the mother was disruptive, leading the therapist to communicate only in writing, which prevented the guardian from discussing her concerns about K. G. with the therapist. And week after week, the mother's disruptions would consume time in K. G's one-hour session.

The mother, along with the guardian, attended K. G.'s last well check with her pediatrician. The mother informed the nurse that she was K. G.'s mother. The nurse sensed tension and called in the practice manager. The practice manager explained to the mother that she needed to allow the guardian to make the decisions. The mother began yelling and was uncooperative. She complained about the nurses drawing K. G.'s blood. She stated that the doctor to whom she previously had taken K. G. was much better and that she would never return to this doctor. The mother was so

disruptive that the staff threatened to eject her from the office. The mother's behavior upset K. G., who began crying.

The guardian sought a psychological assessment of the child. The mother attended the first appointment. But she was disruptive and refused to participate. The mother would not provide any information about K. G.'s background. The session was so problematic that the psychologist contacted the guardian ad litem, which was very unusual. The guardian ad litem instructed the psychologist not to include the mother in the follow-up appointment.

At the hearing on the guardianship petition, the mother conceded that her behavior did not serve K. G.'s best interests. The mother herself testified that the most important consideration in finding a doctor for K. G. is finding one who could accommodate the mother, not finding the doctor who can provide K. G. the best level of care.

The guardian ad litem testified that the problem with the mother's behavior is that when there is such disruption, the service providers refuse to see K. G. again. Eventually, after conferring with the child's attorney guardian ad litem, the guardian decided that it was in K. G.'s best interests to stop notifying the mother of any of K. G.'s appointments because her presence interrupted the provision of services to K. G.

and prohibited the service providers from communicating with the guardian. The mother's behavior became such a problem that the guardian ad litem asked the child's attorney guardian ad litem to seek guidance from the court. The attorney filed a motion for emergency review, asking the juvenile court to prohibit the mother from attending K. G.'s appointments until the mother addressed "her mental health concerns, modifie[d] her behavior[,] and act[ed] in an appropriate non[-]disruptive manner at the appointments." The matter was not addressed in court.

K. G.'s guardian ad litem testified that she prepared a reunification case plan, which included a requirement that the mother obtain a psychological evaluation and parental fitness assessment. Eventually the mother went to the psychologist's office to complete the written tests necessary to begin the evaluation, but the psychologist did not complete the evaluation. He explained in a letter to the guardian ad litem that the mother had failed to answer many questions. The juvenile court amended the case plan to remove the requirements of a psychological evaluation and parental fitness assessment.

As for the remainder of the reunification case plan, the guardian ad litem testified that although the mother completed several components, she did not complete the component directing her to improve her social and emotional skills; this

component was included to allow the mother to enhance her capacity to care for K. G. The guardian ad litem testified that the mother still is unable to get along with other people, leading to conflict with K. G.'s service providers to the point where they do not want to continue providing services to the child. She acknowledged that the mother had made progress on the plan, but she did not believe it was enough to meet the child's needs. The guardian ad litem recommended that the guardian be granted permanent guardianship so that K.G. would not "revert back to where she started two years ago."

The child's attorney guardian ad litem testified that she did not believe that reasonable efforts to reunify K. G. with her mother would be detrimental to the child. She testified that absent a psychological evaluation and a parental fitness assessment, it had not been determined whether the mother could parent appropriately. But only three months before the hearing she had filed the motion for emergency review due to the mother's disruption of the child's medical appointments and her lack of focus on the medical needs of the child.

The juvenile court determined that K. G. had experienced chronic neglect; the judge commented at the hearing that she had never seen a child with Down syndrome with such a degree of developmental delay. She determined that the mother lacks the

necessary skills to be able to meet the child's severe needs and the ability to ensure that K. G. receives the essential services to which she is entitled.

The mother argues that the juvenile court should have denied the guardianship petition because she completed her case plan, but that is belied by the testimony of the guardian ad litem. The mother also points to the attorney guardian ad litem's recommendation that reunification services not be discontinued. But that recommendation was based on her conclusion that absent a psychological evaluation and a parental fitness assessment, it had not been determined whether the mother could parent appropriately. The attorney guardian ad litem's recommendation ignores the fact that the juvenile court removed the requirement of a psychological evaluation and parental fitness assessment from the mother's case plan. Nothing in the record indicates that the mother objected to the removal of these requirements from the case plan. See *In the Interest of D. E.*, 269 Ga. App. 753, 756 (2) (605 SE2d 394) (2004) (objection to reunification plan not raised in the juvenile court was waived). The attorney guardian ad litem's recommendation was simply one factor for the juvenile court's consideration. See *In the Interest of J. B.*, 274 Ga. App. at 20 (we do not weigh the evidence but instead defer to the juvenile court's factfinding).

11

"In light of the foregoing, the juvenile court, as factfinder, could have found clear and convincing evidence which showed reunification not to be in the best interests of the [child] for the likelihood that it would only prolong [her dependency]." *In the Interest of U. B.*, 246 Ga. App. 328, 331 (2) (540 SE2d 278) (2000) (involving termination of parental rights under former Juvenile Code).

3. *Best interests and most appropriate person to be guardian.*

The mother's second enumeration of error is that the juvenile court erred in finding that the appointment of a permanent guardian is in the child's best interests and that her sister is the individual most appropriate to be the child's permanent guardian. But she entirely omits this enumeration from her Argument and Citation of authority. So she has abandoned it. *Hafeez v. State*, 339 Ga. App. 467, 470 (2) (793 SE2d 632) (2016). See also Court of Appeals Rule 25 (c) (2).

*Judgment affirmed. Branch and Bethel, JJ., concur.*